IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERNETAD SYSTEMS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:06-CV-1084-P |
| | § | |
| OPODO LIMITED, AMADEUS GLOBAL | § | |
| TRAVEL DISTRIBUTION S.A., AMADEUS | § | |
| NORTH AMERICA, LLC, OPENTABLE, | § | |
| INC. and BEST WESTERN | § | |
| INTERNATIONAL, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court are:

(1)     Defendant Amadeus North America, Inc. f/k/a Amadeus North America, LLC's
("Amadeus NA" or "Defendant") Motion to Dismiss for Lack of Subject Matter
Jurisdiction or, Alternatively, for Failure to State a Claim, filed August 10, 2006,[1]

(2)     Plaintiff InternetAd Systems, LLC's ("InternetAd" or "Plaintiff") Motion for
Leave to File an Amended Complaint, filed September 13, 2006,[2] and

---

[1] Plaintiff InternetAd Systems, LLC filed its Response on September 13, 2006, concurrent with its Motion for Leave to File an Amended Complaint. Defendant filed its Reply on October 4, 2006, concurrent with its Alternative Motion for Summary Judgment. Initially, Defendant Opentable, Inc. joined in Defendant Amadeus North America's Motion to Dismiss. Subsequent to that filing, the parties filed a Rule 41 Stipulation of Dismissal With Prejudice, dismissing Defendant Opentable, Inc. as a party to this lawsuit. (*See* Stipulation of Dismissal, Nov. 3, 2006.) Accordingly, the Court now DENIES as MOOT any and all pending Motions by Defendant Opentable, Inc. and DISMISSES Defendant Opentable, Inc. from this action.

[2] Defendant did not file a separate Response to Plaintiff's Motion for Leave, but responded to the merits of the motion in its Reply to Plaintiff's Response to Defendant's Motion to Dismiss and Alternative Motion for Summary Judgment ("Def.'s Mot. Summ. J."), filed October 4, 2006.

(3)      Defendant Amadeus NA's Alternative Motion for Summary Judgment, filed
         October 4, 2006.[3]

After reviewing the briefing and applicable law, the Court GRANTS Plaintiff's Motion for

Leave to File an Amended Complaint and DENIES Defendant's Motion for Summary Judgment.

The Court further DENIES as MOOT Defendant's Motion to Dismiss.

## I.      Background and Procedural History

Defendant Amadeus NA provides travel distribution and information technology to travel

providers to enable them to succeed in the travel industry.  (Def.'s Mot. to Dismiss at 2.)

Amadeus NA serves customers such as travel providers (including airlines, hotels, car rental

companies, railway companies, ferry lines, cruise lines, insurance companies, and tour

operators), travel agencies, and travel buyers (corporations and travelers).  (*Id.*)  Plaintiff

InternetAd alleges that Amadeus NA and the other defendants have infringed the patents in

question by employing the technology described in the patents on their World Wide Web

websites.  (*Id.* at 3.)

InternetAd is a subsidiary of Acacia Research Corporation.  (*Id.*)  InternetAd maintains

that it was formed to assist patent owners who lack the time, resources, or knowledge to license

and enforce their patents against infringing companies.  (Pl.'s Resp. to Mot. to Dismiss at 2.)

Defendant avers that InternetAd and its parent company are examples of "patent trolls," a term

---

[3] Plaintiff filed its Response on October 23, 2006.  Defendant filed an untimely Reply on November 13, 2006; however, Defendant bases the arguments in its Reply largely on evidence received from Plaintiff on November 8, 2006, the week the Reply was due.  (*See* Def.'s Reply to Pl.'s Resp. to Mot. Summ. J at 1.) Additionally, Plaintiff was granted leave to file a Sur-reply.  Thus, the Court will consider this Reply when determining the Motions at hand.  Pursuant to an Agreed Order, Plaintiff filed its Sur-reply on December 5, 2006. All other motions in the instant case have been stayed pending the outcome of the motions addressed in this Order. (*See* Order of Oct. 4, 2006.)

coined in the technology industry to describe "a small company who enforces patent rights against accused infringers in an attempt to collect licensing fees, but does not manufacture products or supply services based on the patents in question."  (Def.'s Mot. to Dismiss at 3 n.4.) Defendant moves for dismissal and summary judgment on the basis that InternetAd lacks standing to sue pursuant to the patent agreement (the "Agreement") between InternetAd and the patent owner.

### A.      The Agreement

David Judson ("Judson") is the original owner of U.S. patents numbered 5,572,643, 5,737,619, 6,185,586, and 6,456,025 (the "Patents").  (Pl.'s Resp. to Mot. to Dismiss at 2.) Judson originally granted a license in the Patents to TechSearch, L.L.C. ("TS") on September 9, 2003, evidenced by the Agreement.  (Def.'s Reply to Pl.'s Resp. to Mot. to Dismiss and Alternative Mot. Summ. J. ("Def.'s Mot. Summ. J.") Ex. A.)  On November 13, 2003, TS assigned and conveyed all of its rights and interest in the Agreement to InternetAd.  (*Id*. Ex. E.) Judson assigned his rights to the patents to JS Technologies, L.P. on July 29, 2004.  (*Id*. Ex. C.) On November 4, 2005, JS Technologies, L.P. assigned its entire right, title, and interest in the Patents to AOL.  (*Id*. Ex. D.)

The Agreement states that the Licensor "represents that he is the sole owner of the Patents and has all right, title, claims, interest and privileges arising from such ownership rights, free and clear of liens, encumbrances, rights or restrictions."  (*Id*. Ex. A § 1.1.)  The Agreement further states that, prior to its execution, Judson did not assign, license, or transfer any other

rights "except for the non-exclusive licenses or other covenants set forth on Schedule A"

attached to the Agreement. (*Id*.) Article 2 of the Agreement reads as follows:

> Subject to the Existing Licenses and to Sections 5.3 and 6.2 below, Licensor grants TS the worldwide, right and license under the Patents to make, have made, use, offer or sell products or services covered by the Patents, including the right to grant sublicenses to third party targets of TS's licensing program and Patent enforcement as contemplated hereunder. Except for the limited circumstances as provided for in Section 5.3, Licensor shall not grant any third party a license or other rights under the Patents for so long as TS meets the Minimum Commitments as set forth in Section 6.2 hereunder.

(*Id*. § 2.1.) The Agreement further says that "[a]ll other rights in and to the Patents are hereby

reserved to Licensor." (*Id*. § 2.2.)

Section 3.4 requires that the licensee:

> provide Licensor with copies of all license offers and third party correspondence concerning the Patents and the TS licensing program and enforcement efforts. . . . Licensor's consent shall be required before TS may grant a license or sublicense, or enter into any other agreement or arrangement relating to the Patents, with any related party.

(*Id*. § 3.4.) The licensee is further required in Section 3.5 to consult with the Licensor on

"significant matters" related to licensing and enforcement, including "licensing terms and

negotiations, litigation strategy and technical matters." (*Id*. § 3.5.)

Section 5.1 of the Agreement dictates the enforcement rights of the licensee; specifically,

it states that:

> Subject to the terms of this Agreement, TS will use its best efforts to promptly and continuously pursue licensing and enforcement of the Patents at (as between Licensor and TS) its sole expense. . . . If, in TS's reasonable judgment (taking into consideration Licensor's suggestions and recommendations), it is necessary and appropriate, TS will institute [an] enforcement action against certain or all of the companies that TS believes are infringing the Patents.

(*Id*. § 5.1.)  This Section also makes TS's choice of counsel in such action subject to the Licensor's approval, "which shall not be unreasonably withheld."  (*Id.*)  Section 5.2 gives TS the "sole right," even as to the Licensor, to bring an enforcement action; however, this right is subject to Section 5.3.  (*Id*. § 5.2.)  Additionally, this Section provides for the Licensor to join as a plaintiff in any suit brought by TS, either at its election or upon a finding by the court that the Licensor is an indispensable party.  (*Id*.)  Notably, Section 5.3 states that:

> If for any reason TS elects not to bring suit against an infringer of any of the Patents, Licensor shall have the right to bring suit in his own name, without joining TS as a party, provided he has given TS 60 days'[sic] written notice of his intention to bring such suit and TS has not filed a suit against the infringer within such period.  TS shall have the right to join in any such suit brought by Licensor.

(*Id*. § 5.3.)

Section 6.2 provides that "[t]he rights granted to TS under this Agreement shall automatically convert to a non-exclusive license" if certain minimum conditions are not met; such right to enforce the patent will revert back to the Licensor upon conversion of the license to a non-exclusive license.  (*Id*. § 6.3.)  Article 6 contains several consequences that will occur if the Agreement is terminated or if TS's rights are converted to a non-exclusive license.  (*Id*. § 6.5, 6.6.)  Additionally, subject to Section 5.3, the Licensor "expressly retains no right to sue for infringement of the Patents prior to any termination of this Agreement or conversion of TS' rights pursuant to Section 6.2."  (*Id*. § 6.7.)  Finally, TS must obtain the consent of the Licensor, which shall not be unreasonably withheld, before TS can assign its rights under the Agreement to a party other than the licensee' affiliate.  (*Id*. § 7.1.)

### B.        Pre-existing Licenses

Prior to the Agreement, Judson entered into several license agreements, one of which was

exclusive for a period of time.  (*See* Def.'s Reply to Pl.'s Resp. to Mot. Summ. J. ("Def.'s Reply

to Mot. Summ. J.") at 2.)  This prior license agreement, executed March 14, 1997, is entitled

"Exclusive License Agreement" and states in relevant part that:

> Judson hereby grants [redacted] an exclusive license and right, with the right to
> sublicense, to practice the invention(s) covered by the claims of the Patents.  This
> license shall not be assigned by [redacted] except to a Permitted Assignee.  Judson
> agrees that, without [redacted] consent, he shall not grant any additional license(s)
> to practice the invention(s) covered by the claims of the Patents except to a Permitted
> Assignee.

(Exclusive License Agreement § 3.1 (Def.'s App. in Supp. of Reply to Mot. Summ. J. at 44).)

This license agreement was twice amended.  (Def.'s Reply to Mot. Summ. J. at 2.)  The Second

Amendment, executed on October 31, 2001, substituted an entire new Section 3.1 in place of

Section 3.1 of the original agreement.  (*See* Amendment Number Two (Def.'s App. in Supp. of

Reply to Mot. Summ. J. at 51).)  This new Article 3.1 states:

> Judson grants *Company* a non-exclusive, non-assignable (except as to Permitted
> Assignee), fully paid-up, worldwide license under the Patents to modify, use,
> reproduce, distribute and otherwise exploit (I) the existing [product] and (ii) any
> future-developed products and/or code created by *Company* where use of such
> products and/or code would otherwise be within the scope of any Patent.  This
> license shall extend to end users of any such code.  No right to sublicense under
> the Patents is granted.

(*Id*.)  The amendment further provides that the terms of such amendment "modify and supersede

all inconsistent terms and provisions" contained in the Agreement and the first amendment.  (*Id*.)

### C.     The Allegations

Defendant seeks to convert its original Motion to Dismiss into a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, stating that Defendant now has a copy of the Agreement between Judson and InternetAd, which evidences that Plaintiff does not have standing to bring a patent infringement suit.  (*Id*.)  Specifically, Defendant states that Plaintiff cannot possibly hold "all substantial rights" in the Patents necessary to sue as the sole plaintiff because the patent owner specifically retained substantive rights.  (*Id*.)  Defendant further asserts that the license granted by the Agreement is not exclusive because it is subject to pre-existing third-party licenses, one of which was exclusive for a period of time.  (Def.'s Reply to Mot. Summ. J. at 2.)  Additionally, the patent owner failed to promise not to exclude others from practicing the inventions covered by the Patents.  (*Id*.)  Finally, Defendant avers that, because Plaintiff is not the exclusive licensee, it cannot maintain this action even if it joins the current patent owner as a co-plaintiff.  (*Id*. at 11.)

Plaintiff counters that, pursuant to the terms of the Agreement,  InternetAd is the exclusive licensee of the Patents and holds all substantial rights in the Patents, giving it standing to sue alone for infringement.  (Pl.'s Resp. to Def.'s Mot. Summ. J. at 4.)  In response to Defendant's assertion of an exclusive pre-existing license, Plaintiff states that any prior exclusive license was effectively terminated by the Agreement.  (Pl.'s Sur-reply at 1.)  Plaintiff further argues that, at the least, it can maintain this action as a co-plaintiff with the patent owner. (*Id*. at 11.)

II.     **Plaintiff's Motion for Leave to Amend**

A.      **Legal Standard**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a pleading "shall be granted when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The decision to grant leave to amend lies within the discretion of the trial court. However there is a bias in favor of granting leave to amend and courts should permit the filing of a proposed amendment unless there is a substantial reason for denying leave to amend. *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 598 (5th Cir. 1981).

In determining whether to grant leave to amend, the court may consider several factors, including delay or prejudice to the non-movant, bad faith or dilatory motives on the part of the movant, repeated failure to cure deficiencies, and futility of amendment. *Foman,* 371 U.S. at 182. The Fifth Circuit has defined "futility" to mean that "the amended complaint would fail to state a claim upon which relief could be granted" and has further held that the legal standard developed under Rule 12(b)(6) guides this analysis. *Stripling v. Jordon Production Co., LLC,* 234 F.3d 863, 873 (5th Cir. 2000). In deciding whether claims in an amended complaint are futile, the court may not deny the motion for leave to amend "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotations and citations omitted).

B.      **Analysis**

Plaintiff seeks to amend its complaint to assert that it has the "sole and exclusive right" to enforce the Patents. (Pl.'s Resp. to Mot. to Dismiss at 5.) Defendant argues that such

amendment would be futile because Plaintiff can allege no set of facts that would confer standing

to sue.  (Def.'s Mot. for Summ. J. at 3.)  The Court finds that, when looking only to the

sufficiency of the pleadings and not the underlying evidence as required by the Rule 12(b)(6)

standard, amendment of the complaint would not be futile.  If Plaintiff alleges in its complaint

that it is an exclusive licensee with all substantial rights in the Patents, it has indeed asserted

standing to sue.  Consequently, assuming the undisputed aspects of the complaint are sufficient,

Plaintiff has stated a claim upon which relief can be granted sufficient to survive the Rule

12(b)(6) standard.  Further, this is Plaintiff's first attempt to amend its complaint and it

purportedly does so in good faith.  At this early stage in the case, Defendant has asserted no

prejudice it will suffer as a result of the amendment.  Thus, under the liberal standard for

granting leave to amend, the Court GRANTS Plaintiff's Motion for Leave to File Amended

Complaint and deems Plaintiff's First Amended Original Complaint, submitted with the motion

to amend as Exhibit 1, filed as of the date of this Order.

## III.    Defendant's Motion for Summary Judgment

### A.      Legal Standard

Standing is a threshold requirement to every federal action and must be proved by the

party asserting the right to sue.  *Sicom Sys. LTD. v. Agilent Techs.*, 427 F.3d 971, 976 (Fed. Cir.

2005).  For a patent infringement suit, standing derives from the Patent Act, which states that

"[a] patentee shall have a remedy by civil action for infringement of his patent."  35 U.S.C. §

281 (2006).  "Patentee" includes both the person to whom the patent was issued and any

successors in title.  *Id*. § 100(d).  That is, if a patentee assigns the patent, the transferee may

become the patentee for purposes of Section 281, thereby gaining the right to sue alleged infringers of the patent. *Sicom Sys.*, 427 F.3d at 976.

In addition to an assignee, an exclusive licensee has standing to sue for patent infringement. "An exclusive license is 'a license to practice the invention . . . accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave.'" *Textile Prods. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) (quoting *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930)). An exclusive licensee to whom the patentee transfers "all substantial rights" under the patent may be treated like an assignee and has constitutional standing to sue without joinder of the patentee. *Sicom Sys.*, 427 F.3d at 976. An exclusive licensee to whom the patentee transfers *less* than all substantial rights can sue *if* the patent owner is joined as a co-plaintiff. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1347-49 (Fed. Cir. 2001) (citing *Indep. Wireless Tel. Co. v. Radio Co. of Am.*, 269 U.S. 459, 468 (1926)). If the patentee conveys a mere non-exclusive license, however, the licensee has no constitutional standing to sue, even as a co-plaintiff with the patentee. *Sicom Sys.*, 427 F.3d at 976 (citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995)).

To determine whether all substantial rights have been transferred to a licensee, the court does not look only to whether or not the parties refer to a license as "exclusive," but deduces "'the intention of the parties and examine[s] the substance of what [the licensing agreement] granted' to determine if it conveys all of the substantial rights in the patent and is sufficient to grant standing to the licensee." *Sicom Sys.*, 427 F.3d at 976 (quoting *Prima Tek II, L.L.C. v.*

*A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000)).   Courts pay particular attention to whether a

licensee was granted the full right to make, use, or sell the patent, which is essentially the right to

exclude others from practicing the patent.   *Prima Tek II*, 222 F.3d at 1379-80.   Courts also

evaluate the patent agreement to determine if other rights are retained by the grantor, including

the right of the licensee to sue for infringement without the licensor and the right of the licensee

to assign its rights or grant sublicenses.   *See, e.g., Intellectual Prop. Dev.*, 248 F.3d at 1344-45

(evaluating whether transferee effectively obtained the sole right to sue or right to assign its

benefits to a third party when determining whether transferee had "all substantial rights" in the

patent); *Speedplay Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000) (finding that,

although patent owner retained the right to initiate suit, the licensee could circumvent such suit

by granting the infringing third party a license, and thus had all substantial rights in the patent);

*Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132-33 (Fed. Cir. 1995) (determining that a

licensee held less than all substantial rights in a patent because the patent owner retained the

right to initiate suit and the right to prevent the licensee from assigning its rights); *Vaupel*

*Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875-76 (Fed Cir. 1991)

(determining that a patent owner's retention of a veto right on sublicenses was not enough to

divest licensee of all substantial rights in the patent because patentee still obtained the sole right

to bring an infringement action).

B.      **Analysis**

i.      **Right to Exclude**

"In evaluating whether a particular license agreement transfers all substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys in full the right to exclude others from making, using and selling the patented invention in the exclusive territory." *Prima Tek II*, 222 F.3d at 1379.  This right to exclude may be express or implied within the agreement.  *Rite-Hite Corp.*, 56 F.3d at 1552.  If the patent owner retains even a limited to right to make, sell, or use the patent, the agreement does not convey in full the right to exclude.  *Id.; see also Abbott Labs.*, 47 F.3d at 1132-33.  Further, courts have held that the existence of pre-existing, non-exclusive licenses does not necessarily defeat a grant of exclusivity.  *See Applied Interact LLC v. Vt. Teddy Bear Co.*, No. 04 Civ. 8713, 2005 U.S. Dist. LEXIS 15016, at *9 n.4 (S.D.N.Y. July 28, 2005); *Refac Int'l Ltd. v. Visa USA, Inc.*, No. 89 Civ. 2198, 1990 U.S. Dist. LEXIS 11942, at *5-6 (N.D. Cal. June 26, 1990) (citing *Waterman v. Mackenzie*, 138 U.S. 252, 261 (1891)).

In the instant action, InternetAd argues that it has the sole and exclusive right to make, have made, use, offer, or sell products or services covered by the Patents, while Amadeus NA avers that the Licensor also has this right.  The Licensor agreed not to grant any third-party licenses for those rights or any other rights under the Patents as long as the licensee met the minimum commitments.  InternetAd argues that "the patentee did not retain a right to practice the patented invention through a non-exclusive license or otherwise."  (Pl.'s Resp. to Mot. Summ. J. at 5.)  However, the Licensor also fails to deem the licensee's rights under the grant

"exclusive" or expressly indicate that the Licensor itself cannot practice the patent.  In Article 2.2, the Licensor specifically retains all rights in and to the Patents other than those granted in Article 2.1.  Without more, these provisions could indicate that the Licensor retained for itself the right to make, use, or sell the patented products, making the license non-exclusive.

However, InternetAd further argues that, because the Agreement refers to different conditions that may convert the license to a *non-exclusive* license, the parties impliedly intended the license to be exclusive.  At least one court has found this indicative of an exclusive license. *See James v. Victor Co. of Japan*, No. AW-98-862, 1998 U.S. Dist. LEXIS 19854, at *14-15 (D. Md. July 29, 1998) ("The fact that [the grantor] specifically reserved the right to convert the license to a non-exclusive license demonstrates that this is an otherwise exclusive license.") Although the Licensor did not expressly deem the right to make, use, or sell the patented products exclusive to the licensee, the fact that the Licensor reserved the right to convert the license to a non-exclusive license implies a promise of exclusivity.  What is more, the right to make, have made, use, or sell the patents is "subject to" the prior existing licenses and Sections 5.3 and 6.2 of the Agreement.  Under the traditional maxim that the express inclusion of one thing implies the exclusion of all others, the Court reads the grant in Section 2.1 of the right to make, use, or sell the patented invention subject only to the listed conditions, and not any other party's right, including the Licensor, to concurrently make, sell, or use the product.  Thus, the Court finds that the Licensor retains no right to personally make, use, offer, or sell the patented invention.

The Court also finds the conditions placed on the right to make, use, or sell the patent do not defeat its exclusivity or the transfer of all substantial rights. Defendant cites *Abbott* for the proposition that an exclusive licensee does not have standing to sue without joinder of the patent owner if its license is subject to other nonexclusive licenses. 47 F.3d 1128. The court in *Abbott*, however, did not specifically make this finding; rather, it found the existence of prior nonexclusive sublicenses a factor that weighs in favor of determining a licensee was not granted all substantial rights. *Id.* at 1132. Accordingly, the existence of such licenses is not dispositive on the issue of whether a license is exclusive or whether a licensor has transferred all substantial rights to a licensee. In this particular case, the Court fails to see how the existence of prior non-exclusive licenses, the rights of which are preserved in the Agreement, defeats the transfer of the Licensor's exclusive right to make, use, or sell the patented invention to the licensee. The holders of the prior non-exclusive licenses have no standing to sue, but rather hold only a promise from the Licensor that they will not be sued for infringement. Under the Agreement, the licensee agrees to abide by the promises made in the prior non-exclusive agreements, but still gains the right from that time forward to exclude all others from practicing the patent. Therefore, the Court finds that the existence of non-exclusive licenses did not prevent the Licensor from granting the full right to exclude to the licensee.

Likewise, Section 6.2 does not defeat a grant of the full right to exclude. "The right of the patentee to terminate the license in the event of the licensee's failure of performance does not negate the substantiality of the exclusive transfer of all rights to make, use, and sell the licensed product." *McNeilab Inc. v. Scandipharm, Inc.*, No. 94-1508, 1996 U.S. App. LEXIS 19073, at

*8 (Fed. Cir. 1996) (unpub.) (citing *Vaupel*, 944 F.2d at 875).  Section 6.2, which InternetAd's

right to make, use, or sell the patent is subject to, enumerates commercial conditions that the

licensee must meet to retain this exclusive right.  However, this section also provides InternetAd

with the right to cure such deficiencies before the license will convert to a non-exclusive license.

These conditions protect only the Licensor's financial stake in the patents and do not change the

parties' intent that the Agreement grant an exclusive license.  *See McNeilab Inc.*, 1996 U.S. App.

LEXIS 19073, at *8-9.  Thus, Section 6.2 does not defeat the grant of exclusivity.

The other condition on the right to make, use, or sell the patented invention, Section 5.3,

allows the Licensor to bring suit or presumably grant a sublicense to an infringer in the event

InternetAd fails to do so.  As discussed in more detail below, this limited circumstance in which

the Licensor can bring suit or grant a sublicense can be effectively destroyed by the licensee;

thus, Section 5.3 does not divest InternetAd of the right to exclude.

The Court now turns to whether the "Exclusive Licensing Agreement" granted by the

patent owner prior to the Agreement destroys InternetAd's right to exclude.  As noted above,

pre-existing *non-exclusive* licenses do not prevent exclusivity.  Amadeus NA argues that one of

the pre-existing licenses, the Exclusive License Agreement, was exclusive for a period of time,

and therefore defeats InternetAd's right to exclude.  Defendant avers that during the period the

license was exclusive, the licensee could have assigned or granted an exclusive license in its

patent rights; thus, InternetAd took under the Agreement subject to any rights of licensees who

took from the holder of this prior exclusive license.  The Court finds that the Exclusive License

Agreement was clearly converted to a non-exclusive license in the second amendment executed

on October 31, 2001.  (*See* Def.'s App. in Supp. of Reply to Mot. Summ. J. at 49.)  Amadeus NA

offers no proof that the holder of the prior exclusive license ever assigned its rights or granted

any exclusive licenses in the Patents; rather, Amadeus NA asserts that the licensee *could* have

done so.  However, Plaintiff offers evidence that no such sublicense was granted by the holder of

the prior exclusive license.  Judson, the grantor of the Exclusive License Agreement, states in an

affidavit that, during the period the license was exclusive, he has personal knowledge that the

company holding the Exclusive License Agreement "did not license any rights in [the] Patents to

any person or entity."  (Judson Aff. ¶ 5 (Pl.'s App. in Supp. of Sur-reply to Def.'s Mot. Summ. J.

at Ex. F).)  When InternetAd entered into the Agreement, the prior exclusive license, from which

no sublicense was granted, had been converted into a non-exclusive license by the second

amendment; such a prior non-exclusive license does not defeat exclusivity.  This is further

evidenced by the fact that the Agreement grants license rights to InternetAd "subject to those

certain pre-existing, *non-exclusive* grants that were made by the Licensor prior to the Effective

Date . . ."  (Agreement at 1 (Def.'s Mot. Summ. J. at Ex. A) (emphasis added).)  Therefore, the

Court concludes that any licenses existing prior to execution of the Agreement were non-

exclusive and do not vitiate the grant of exclusivity.

Accordingly, the Court finds that the Agreement grants InternetAd the exclusive right to

make, have made, use, offer, or sell the patented invention.[4]

---

[4] Based on this conclusion, the Court notes that, even if InternetAd lacks standing to sue as the sole plaintiff, at the least, InternetAd has standing as an exclusive licensee to sue as a co-plaintiff with the current patent owner.

### ii.      Restrictions on Alienation

The Agreement at hand contains two restrictions on alienation: (1) the Licensor's consent must be obtained for any agreement with a related party, and (2) the Licensor's consent must be obtained, but not unreasonably withheld, for an assignment by the licensee to a party other than the licensee's affiliate.  The Court finds these restrictions on alienability distinguishable from the cases which hold that restrictions on the right to sublicense and assign are fatal to a grant of all substantial rights in a patent.

First, regarding the right to grant sublicenses, the Agreement at hand only requires the consent of the Licensor in the event the licensee seeks to grant a sublicense to a party with which the licensee has an ongoing business relationship.  In all other circumstances, the licensee has the sole right to grant a sublicense to third parties.  In *Vaupel*, the court found a full right to veto a sublicense retained by the Licensor only a "minor derogation from the grant of rights."  944 F.2d at 875.  The court cited to *Bell Intercontinental Corp. v. United States*, which states: "That the original agreement did not transfer to [the assignee] the right to sublicense others is without significance for such a limitation 'does not interfere with the full use of the patent by the assignee . . . [and] the assignor retains no use of the patent for himself by reason of the limitation since he has granted the exclusive rights to the assignee.'"  381 F.2d 1004, 1017 (Ct. Cl. 1967) (quoting *Rollman v. Commissioner*, 244 F.2d 634, 640 (4th Cir. 1957)).  The Court finds this reasoning persuasive.  The Licensor's retention of the right to veto sublicenses to related parties appears to be a means to protect the Licensor's financial interest in the patent.  That is, the Licensor is safeguarding itself from any negative consequence of the licensee's decision to grant

a sublicense to a party with which the licensee has a potential conflict of interest.  Other than this unlikely situation, InternetAd can sublicense, without restraint, to whomever they choose.  Such a limited veto on sublicenses does not indicate ongoing control by the Licensor that would significantly diminish the licensee's otherwise exclusive right to sublicense.

With respect to the right to make an assignment, the Federal Circuit has held that "[w]hen payment depends on the licensee's commercial performance in the future, the grant of the exclusive right to make, use, and sell the licensed subject matter is not significantly diminished by reasonable conditions to assure that the license remains with the chosen licensee." *McNeilab Inc.,* 1996 U.S. App. LEXIS 19073, at *9-10 (citing *Vaupel*, 944 F.2d at 875).  In more recent cases, the Federal Circuit has indicated that a restriction on the right to assign is fatal to the argument that a licensee has been granted all substantial rights.  *See, e.g., Propat Int'l Corp. v. RPOST, Inc.*, Nos. 2006-1222, 2006-1223, 2006-1270, 2007 U.S. App. LEXIS 77, at *10-11 (Fed. Cir. Jan. 4, 2007) (citing *Sicom Sys.*, 427 F.3d at 979).  However, in each case finding restrictions on the right to assign an indication that not all substantial rights have been transferred, the Licensor had an unfettered right to withhold its consent to an assignment.  *See Propat*, 2007 U.S. App. LEXIS 77, at *10-11; *Sicom Sys.*, 427 F.3d at 975, 979; *Intellectual Prop. Dev.*, 248 F.3d at 1342; *Abbott Labs.*, 47 F.3d at 1132.  Under this Agreement, the Licensor cannot unreasonably withhold its consent for an assignment to a non-affiliate of the licensee.  InternetAd could seek redress if it believed the Licensor was unreasonably withholding its consent to assign.  Thus, the Court finds the Licensor's qualified right to approve assignments a reasonable condition in place to protect the Licensor's financial interest under the contract, and not a retention of proprietary rights in the Patents.

In sum, although the Licensor retains narrow rights in limited circumstances to protect its remaining interest under the Agreement, the Court finds that such restrictions on alienability do not defeat the parties' overall intention to grant all substantial rights to the licensee.

### iii.    Right to Sue

The Licensor retains a limited right to sue in the instance InternetAd fails to do so. InternetAd cites *Speedplay* for the proposition that a reservation by a licensor to bring suit in its own name does not indicate that the licensor did not grant all substantial rights if the licensee can grant any purported infringer a license, thereby extinguishing the licensor's purported right to sue. *See* 211 F.3d at 1250-51. The instant facts are slightly distinguishable from the facts in *Speedplay*. "In Speedplay, the exclusive licensee had complete effective control over litigation decisions, and the patentee did not have the right to veto the licensee's decision to transfer its rights under the agreement." *Propat*, 2007 U.S. App. LEXIS 77, at *13. In this case, InternetAd does not have the absolute right to sublicense because InternetAd must obtain the Licensor's consent to sublicense to a related party; accordingly, if InternetAd chose not to sue a related party, but instead wanted to grant such party a sublicense, the Licensor could presumably withhold its consent to the sublicense and bring suit against the related party in the event InternetAd failed to do so. However, as a practical matter, this limited circumstance that would allow the Licensor to bring suit in its own name is insufficient to destroy InternetAd's right to sue. InternetAd has ultimate control over the Licensor's right to sue because, even with a related party infringer, InternetAd can always initiate suit against such a party if the Licensor fails to

consent to a sublicense.[5]  Thus, the Licensor has no right to sue without an affirmative decision

by InternetAd not to sue, which gives InternetAd ultimate control over litigation decisions.

Because the licensee can ultimately control whether or not the Licensor brings suit in its own

name, the Court finds the licensee has the sole right to sue, which leans in favor of a grant of all

substantial rights.

### iv.      Other Rights Retained by the Licensor

Finally, courts evaluate various other rights, such as the licensor's right to join suit, right

to compensation, right to be consulted and informed about litigation decisions, and right to

approve the licensee's counsel, when evaluating whether a licensee has been granted all

substantial rights in a patent.  *See, e.g., Propat*, 2007 U.S. Dist. LEXIS 77, at *9 (considering the

licensor's right to an equity interest and right to notice of litigation decisions when determining

that a licensee did not hold all substantial rights in a patent); *Intellectual Prop. Dev.*, 248 F.3d

1333 (taking into account the owner's right to be consulted about litigation and right to litigation

proceeds when determining that the licensee held less than all substantial rights in a patent);

*Abbott Labs.*, 47 F.3d at 1132 (considering the licensor's right to participate in any suit with its

own counsel).  However, such factors are not dispositive, but only weigh in favor of finding an

exclusive licensee with less than all substantial rights.  *See Propat*, 2007 U.S. Dist. LEXIS 77, at

*9 ("To be sure, the fact that a patent owner has retained a right to a portion of the proceeds . . .

does not necessarily defeat what would otherwise be a transfer of all substantial rights in the

---

[5] This is distinguishable from *Propat*, where the licensee was required to obtain the consent of the licensor
to all licensing and litigation decisions.  *Propat*, 2007 U.S. App. LEXIS 77, at *13.  Here, if InternetAd chooses to
sue, the Licensor has no control to veto such a decision.

patent."). The Court can find no case where other factors, not coupled with the retention of ownership rights such as the right to sublicense, assign, bring suit, and exclude, led to a determination that a licensee was granted less than all substantial rights. When considering the Agreement as a whole and the reasons discussed above, the Court does not find the Licensor's retention of the right to approve the licensee's counsel, the right to proceeds, the right to be informed regarding litigation and licensing decisions, or the right to join suit, significant enough to destroy a grant of all substantial rights to InternetAd.

Accordingly, the Court holds that InternetAd is an exclusive licensee with all substantial rights in the Patents and has standing to bring this action without joinder of the patent owner. Therefore, summary judgment based on lack of standing is inappropriate.

## IV.    Conclusion

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Leave to File an Amended Complaint and DENIES Defendant's Motion for Summary Judgment. Additionally, because Defendant's Motion to Dismiss was converted into a Motion for Summary Judgment, the Court DENIES as MOOT Defendant's Motion to Dismiss.

**It is so ordered.**

Signed this 22nd day of January 2007.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE